Read v. Manning.

———◆———

IRA D. READ, Appellant, v. REUBEN S. MANNING, Appellee.

1. CODICIL : REVOCATION.—A codicil, duly and legally executed, which makes a disposition of the testator's property inconsistent with the disposition made in the will, is, to the extent of such inconsistency, a revocation thereof, without an express clause for that purpose; and it will so operate, although the disposition attempted to be made by the codicil, is void for illegality.

2. SAME.—Where a testator, by his will, gave his slaves absolutely to his widow, but, by a codicil thereto, gave them to her, "if she should marry, and have issue; otherwise that they should be set free :" the codicil, although void to the extent of the attempted emancipation of the slaves, revokes the bequest of them made in the will ; and the widow can only claim such interest in them as is vested in her by the terms of the codicil.

3. STATUTE : CONSTRUCTION.—A statute must be so construed as to effectuate the policy intended to be established by the legislature, by its enactment.

4. SAME.—The act of 1842, (Hutch. Code, 539, ? 11,) which provides, that slaves emancipated by will, shall go, and descend to the heirs at law of the testator, or be so disposed of, as if he had died intestate, applies to all wills, whether made and probated before or after its passage.

APPEAL from the District Chancery Court, at Holly Springs. Hon. Henry Dickinson, vice chancellor.

The brief of Judge Clayton contains a correct history of the case.

A. M. Clayton, for appellant.

This is an appeal from the District Chancery Court at Hernando.

The bill was filed by the appellant, as administrator de bonis

*non,* with the will annexed, of his brother, Zalmon Read, deceased, to recover certain slaves from the defendant, upon the ground, that the bequest of freedom to the slaves, contained in the codicil to the will of Zalmon Read, was void, and that they belonged to the next of kin. It makes the will and codicil an exhibit, and states that the testator, in the body of his will, gave all his slaves to his wife Eudoxy. This will was made in North Carolina, in the year 1836. By the codicil, which bears date, 4th of July, 1845, he says: "N. B. I moved to Mississippi since I wrote this will. If my wife should marry, and have issue, then she can hold all my property; otherwise I will all my negroes to be free."

His wife survived him; afterwards married the defendant, Manning, and died without issue. The defendant demurred to the bill, and claims the negroes in his own right. The court below sustained the demurrer, and dismissed the bill, and the cause thence comes by appeal to this court.

The statute of 1842, (Hutch. Code, 539,) makes void all bequests of freedom to slaves, and directs "that they shall, in such event, descend to, and be distributed amongst the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate."

A bare reference to this act, would have been deemed by us to be decisive of the case, if the vice chancellor had not held differently. The ground of this decision was, that, as the codicil could not take effect, it left the original will in force; or, that the wife, being the residuary legatee under the will, the failure of the codicil to take effect, left the slaves to her, as a part of the residuum. We think this view erroneous, and shall proceed at once to examine it.

The bequest contained in the codicil is void, not because the instrument was not executed according to law, but because the bequest is contrary to the declared policy of the state, and is therefore not permitted to take effect. The statute does not make the testamentary paper void as such; it only makes the bequest of freedom void. The bequest contained in the codicil in regard to the slaves, being inconsistent with and contrary to the disposition made of the same slaves by the will, was a *revocation* of the will,

to the extent of the disagreement or inconsistency. See 1 Jarm. Wills, 156; 1 Lom. Ex'ors, 49; Chilt. Prob. Ct. Law, 68.

This provision of the codicil is inconsistent, not only with the specific, but with the residuary bequests contained in the original will. It shows a total and entire change of intention, in regard to the disposition to be made of his negroes. They were to be freed, unless his wife should marry, and have issue. This event did not take place. The original will, in reference to the slaves, was, beyond all doubt, revoked in all its parts, and was as if it had never been made. A will once revoked, cannot be revived or set up again, by any act which does not show that it was the intention of the. testator to revive and re-establish it. This is the true and sole test. 1 Lom. Ex'ors, 49, 53. No such intention, but the contrary, appears in this instance. To hold, therefore, that the slaves should go according to the will, because the bequest in the codicil is illegal and void, wholly sets aside the statute, and amounts to a repeal of its provisions.

The statute forbids such a bequest; and upon general principles, a disposition contrary to the prohibition, would be void. *Brien* v. *Williamson*, 7 How. 31. This is the legal consequence, even though the last clause of the eleventh section of the act of 1842, should be restricted in its operation to the paragraph immediately preceding it, as it was contended by counsel below should be done. But we see no reason for such restriction, and think the clause extends to every possible case of a bequest of freedom to slaves. This court seemed to regard ours as the undoubted construction in *Hairston's Will*, 5 Cushm. 717; and we never heard a different interpretation suggested, until the argument in this case. Such, too, was the view of the court in *Weatherby* v. *Weatherby*, 13 S. & M. 685. The court there said: "The bequest of freedom is void. If there had been a direct bequest of freedom to these slaves, it would have been entirely ineffectual, and they would have been subject to distribution, as if no will had been made." The application of this principle would be decisive of this case.

At common law, the decisions are that a *general* residuary bequest, includes everything of the testator not otherwise validly disposed of. 1 Jarm. on Wills, 587; *Lucky* v. *Dikes*, 2 S. & M.

Read *v.* Manning.

60. But surely this common law rule can have no effect, after a statute has declared, that in such case, slaves shall go to the next of kin. It was as competent to the legislature to change this, as any other rule of the common law.

The state has a right to prescribe its own policy, in regard to emancipation. One of the highest acts of sovereignty a government can perform, is to adopt a new member of the community, with all the privileges and duties of citizenship. To allow individuals to exercise this power would be wholly inadmissible. *Fisher's negroes* v. *Dabbs*, 6 Yerg. 119. This state has thought it prudent to protect her people against such consequences, by making every bequest of freedom void, and by declaring that in such case, the slaves should go to the next of kin, as if no will had been made. This very provision was probably adopted, to prevent evasions of the statute, and to defeat secret trusts that might be created to elude the policy of the law. It cuts off all rights at once, either of specific or residuary legatees, and makes it the interest of the next of kin, to watch over and prevent a violation of the law. In this case too, we insist, that there is in reality no interest or title in any legatee under the will to the slaves. The whole disposition made of the slaves by the original will is entirely revoked by the codicil, and an entirely new provision introduced. As that provision is rendered void by the statute, and as there has been no intention manifested to revive the revoked will, all that remains to be done is to declare the bequest of freedom void, and to let the law take its course, in giving the slaves to the next of kin.

An examination of the original will, we think, will likewise satisfy the court, that it contains no general residuary clause, which even if unrevoked, could embrace these slaves. It points exclusively to other property, and will be confined to what was intended by the testator. *Lucky* v. *Dykes*, 2 S. & M. 60.

None of the cases in our reports, at all conflict with the views herein set forth. *Ross* v. *Vertner*, 5 How.; *Am. Col. So.* v. *Wade*, 7 S. & M.; *Shattuck* v. *Young*, 2 Ib.; and, *Lucky* v. *Dykes*, Ib. 60, all had their origin in wills which took effect, before the statute of 1842 went into operation. The case of *Weatherby* v. *Weatherby*, 13 S. & M., was held not to fall within

that act, because there was no direct bequest of freedom to the slaves. It was taken for granted, if there had been, that the bequest would have been void, and that the slaves would have gone to the next of kin.

In *Hairston's Will case*, 5 Cushm. 717, it appears to be conceded, that although the bequest of freedom was void, still that the will containing the bequest was a revocation of all former wills of the testator, and that the property was left to descend and be distributed, as if he had died intestate. The same result in this case would seem to be inevitable, unless there be some difference in the effects of an implied, and an express revocation, or between a revocation *pro tanto*, to the extent it goes, and an entire revocation. No such distinction is made in the books.

*Yerger* and *Rucks*, on same side.

1. Did the codicil revoke the previous will in favor of Mrs. Read? A codicil is intended either to alter, add or subtract something from an original will, and is deemed a part and parcel of the testament, and so construed.

Wherever the disposition of the property by a codicil executed after the will, is in conflict with the provisions of the will, the codicil will be deemed a revocation of the will. 1 Jarm. on Wills, 156; 1 Swinburne on Wills, 13, 14.

A reference to the codicil will show an entire and total change of the testator's intention. By the will, the testator's property was given absolutely to the wife: by the codicil, made many years subsequently, and after his removal to Mississippi, he declares that his wife shall hold all of his property, "if she should marry and have issue." The words of this bequest make the marrying and having issue, a condition precedent to the wife's right to the property. As a further evidence that the testator had changed his intention as expressed in the will, to give his wife the property absolutely, he makes another and a different disposition of it in the event of her failure to marry and have issue. It is true that the disposition made of it in the codicil, being a bequest of freedom to the negroes, is illegal and void, still it shows that the mind of the testator had changed after the execution of the will, and that

he did not intend his wife to take the slave as expressed in the will, but only upon the conditions stated in the codicil. Although the bequest of freedom to the slaves could not be enforced as a testamentary disposition of the property, still it may be looked to as evidence of the intention of the testator, and might even in itself constitute a revocation of the bequests in the will. In England, it was held prior to the Statute of Frauds, that if a man devise land to one by will in writing, and after devise it to another by parol, although the last bequest is void as a will, yet it is a revocation of the former. 2 Swinburne on Wills, 532.

The sole question presented in this case is, whether the testator, by the codicil, intended to alter the disposition of his property, and affix a condition to his wife's enjoyment of it, which was not made in the original will. An inspection of the codicil and the language used in it, will decide this question affirmatively.

. The bequest of freedom to the slaves is admitted to be void; and as the bequest to the wife was revoked by the codicil, the slaves, which would have become the property of the wife, if the conditions of the codicil had been complied with, remain undisposed of, and must be distributed according to law. *Lucky* v. *Dykes*, 2 S. & M. 60.

*Brown* and *Frazer*, for appellee.

In this cause the court did not err in sustaining defendant's demurrer, and dismissing complainant's bill.

The complainant's bill and exhibit filed therewith, does not present a case for relief.

A codicil as in this case, is a continuation of the will, constitutes a part of it, and is construed together with the will, as one entire instrument. See 1 Ves. 178, 186.

A codicil and will being one entire instrument, taken and construed together as the will of the testator, the well established rule of law then prevails, that all personal property of the testator not disposed of, or ill disposed of, that by lapse, or void bequest for illegality, does not pass as directed by the testator, goes to the residuary legatee. See *Hamblin* v. *Terry*, S. & M. Ch. R. 589; *Vick* v. *M'Daniel*, 3 How. R. 337; *Lucky* v. *Dykes*, 2 S. & M. 60.

It is evident in the case now before the court, that Zalmon Read, the testator, in his will made in North Carolina, in 1836, made Eudoxy Read, his wife, a specific legatee, and his residuary legatee.    In the will, he gives off specific legacies to his relations, before he mentions her in his will: he then gives her specific legacies, and in the residuary clause gives her all of his property.

In 1845, after the testator had removed to the State of Mississippi, he adds a codicil to his will, in which he states, in substance, that if his wife Eudoxy, "marries and has issue," she can hold all of his property, (meaning his personal property,) otherwise, he wills his negroes to be free.

It is evident, if this bequest of freedom to the slaves was valid under the laws of the State of Mississippi, they would have been free until she married and had issue; but it being an illegal bequest, they go to her as the residuary legatee.

Our Supreme Court decided in the case of *Weatherby* v. *Weatherby*, 13 S. & M. 685, that a condition imposed upon an unqualified bequest was void if it attempted to secure freedom to slaves, and the property would vest in the legatee.

The complainant, through his counsel concedes and admits, that by the laws of this state, up to the time of the act of 1842, (Hutch. Code, § 2, 539,) and on general principles, Eudoxy would be the residuary legatee under this will, and as such would take the negroes attempted to be set free in the codicil, on the ground of illegality. This is correct: the bequest of freedom being illegal, the residuary legatee takes the property as being illegally disposed of.    See 3 How. 337, and 2 S. & M. 60.

Does the act of 1842, cut Eudoxy out of the residuum in this case?    We contend it does not: that act had a twofold purpose:— first, it is prohibitory—not allowing after its passage, the emancipation of slaves in this state by last will: therefore, and consequently, a violation of that portion and section of the act of 1842, by a testator, in freeing or attempting to free, or emancipate his slaves, would be illegal, contrary to law; and as a void bequest, would go to the residuary legatee, and not to the next of kin.

The second portion of that act and its provisoes, could not by any possible construction, embrace a case like the present, or any

Read v. Manning.

one that might arise after its passage. In reading the eleventh section of that act, we can only regard it as directory, for it speaks in substance, and addresses itself alone to executors of wills theretofore made, imposing upon them a limitation of twelve months, (unless legally prevented,) in which they shall discharge their duties in the removal or emancipation of slaves, directed by the will of which they are the executors,—if they the executors should fail to carry out the trust, in removing, or emancipating the slaves, directed by wills heretofore made in the time prescribed by the latter portion of that section, then the slaves so attempted to be emancipated or set free, shall descend to the heirs at law of the testator as if he had died intestate. The act does not speak of slaves which are attempted to be emancipated after the passage of the act descending to the heirs at law, instead of the residuary legatee, on the ground of a void bequest: it only speaks of wills heretofore made, and cannot possibly mean more than it says.

*D. C. Glenn*, on same side.

Counsel of appellant, it seems to me, are mistaken in the effect which they give to the 11th section of the act of 1842, Code, 539. I will not say the construction of the act, because there is no question of construction involved. There are two different cases provided for by it, and there can be no doubt as to either.

The first is, that it shall not be lawful, after the passage of the act, to emancipate slaves by last will and testament. Such a will is absolutely void.

The second is, that in cases where wills have been made previous to the passage of the act and admitted to probate, whereby slaves have been directed to be removed from the state, for purposes of emancipation, or have been conveyed in secret trust for such purpose, unless such slaves shall be removed within a year of the passage of this act, it shall not be lawful to remove said slaves, but the same shall descend to, and be distributed amongst the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if the testator had died intestate.

In the one case the act declares certain devises void, and leaves the consequences to be regulated by the general rules of law. In

so doing, it operates on all cases of future devises to the prohibited character.

In the other, the act is confined in its operation by express terms to certain devises, "heretofore made and admitted to probate in this state;" and it is only to such devises that the consequences pointed out in the act, attach.

By one, it is declared as the policy of this state, that devises of emancipation shall be void. By the other, provision is made for cases which have already occurred, and certain consequences attached to them, in order to guard against the injurious results which might flow from them, i. e., the protracted stay of freed slaves in the midst of a slave community.

One was to ordain a general rule and settle a general policy for the future, the other to provide for special cases in the past. All devises against the policy are declared void. The latter is enforced by special penalties.

The legislation in the two clauses is separate and distinct, on distinct subjects, and with distinct results.

My learned friend, Judge Clayton, is wholly mistaken in his argument, when he says, "The statute of 1842, (Hutch. Code, 539,) makes void all bequests of freedom to slaves, and directs that *they* shall in such event descend to, and be distributed amongst the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate:"

A "bare reference" to this law would have been decisive of this case, had the law read as it is recited by the judge. Such is not the law. Such devises are void, simply,—no more,—and the general law is left to regulate the consequence. The last clause applies to another and different case. Of course, the passage quoted was not designed, but it is calculated to mislead, as it is written. As written, it is not the law.

This court has nowhere held that the specific penalty or consequence provided for in the second clause of the act applied to, or was attached to those devises pronounced void in the first. Avoidance is the penalty of the first, distribution by law of the property, a *conditional* penalty of the second.

The point was not raised, considered, or ruled in *Hairston's case,*

5 Cushm. 717.    The question of the domicil of Hairston, and whether the widow's rights were determined by the laws of this state or Virginia, were alone considered in that case.

The case cited, of *Weatherby* v. *Weatherby*, 13 S. & M. 687, is not an authority.    The point in issue in the case at bar, was not before the court, and the remark quoted from the opinion was evidently a passing one, inconsiderately made.    The question in that case was, whether a direct bequest to one, coupled with a void condition, was not absolute, and the court properly held that it was.    It was not essential to a decision of the case, and being an "*obiter dictum*," is not at all obligatory as part of the opinion of the court.    Judge Clayton for the court then, as the same gentleman for his client now, was in error in regard to the law on which he was commenting.    It was not necessary "to take for granted" anything in the cause, and the opinion should be confined to the case before it.

In this case there was no revocation of a former will, unless there was such by way of implication.

In *Hairston's case*, 5 Cushm. 717, the testator bequeathed all his property to a negro slave, which was void, but at the same time, in the same instrument, he inserted a specific clause, expressly "revoking all former wills and testaments previously made by him." The effect of such a devise and such a revocation, is now before this court.    In this case there was no revocation of any former will, but simply a void bequest of emancipation.    *Brant* v. *Wilson*, 8 Cow. 56.

Mrs. Read was made the general residuary legatee of the testator, by the first will.    No set words are required to make her so : it is sufficient if such intention is made clear.    After certain specific legacies, he says : "I give and bequeath to my dearly beloved wife, Eudoxy Read, my whole estate, both real and personal, forever."    He then gives her all his land, and all which he may acquire ; all his slaves, and all which he may acquire ; all his money and bonds, household stock, and crops, and all other articles, of every sort and kind, he gives and bequeathes to his wife and her heirs forever.

It is admitted, that all personal property of the testator not dis-

posed of, or ill¹disposed of, that by lapse or void bequest for illegality does not pass as directed by the testator, goes to the residuary legatee.    S. & M. Ch. R. 589; 3 How. 337; S. & M. 60.

This is, however, said to be the rule at common law, and the legislature is competent to change it.    Admitted.    But has it changed it?    Clearly not, if I am right in my argument, and language means anything.

I admit the competency of the legislature to establish a rule of policy for the state, and I also admit that it is its declared policy, that bequests of freedom to slaves, shall be void.    But it has nowhere, at any time, declared what shall be the conveyance of such void bequests, nor have the courts, anywhere, on a case made, ever declared any consequences.    Passing remarks, loose expressions, or " *obiter dicta*" of judges, do not make law, but frequently unmake it.    The law-making powers declare emancipation bequests void, and there they stop.    Many devises were void at common law, and before this act.    When made, the rules of law pointed out the parties entitled to the subject-matter of the devises.    The legislature only adds one other, growing out of our domestic policy, and leaves to the rules of law pre-existing, to settle the *status* and final disposition of the property covered by such void bequest or devise.

Such are the principles which govern this case, and which clearly upholds the decree of the chancellor.

HANDY, J., delivered the opinion of the court.

The question presented in this case, in relation to the effect of the codicil upon the provisions and dispositions of the will, with which it is inconsistent, is substantially the same as that presented in the case of *Robert Hairston et al.* v. *Ruth S. Hairston et al.*, decided at the present term.    The only difference between the two cases is, that the last will in that case, contained an express clause of revocation of former wills, and in the present case, the codicil does not expressly revoke the will.    The dispositions in the codicil are, however, entirely inconsistent with those of the will, and must operate in law as a revocation of the will, to the extent of the inconsistency.    And there is no difference in this respect, between a will expressly revoking former wills, and one containing no such

express revocation, provided they be both duly and legally executed, so as to be admitted to probate.

Another question is presented in this case, which it is proper to consider, in order to settle the construction to be given to the statute of 1842, in relation to the emancipation of slaves by last will and testament. Hutch. Code, 539, § 11. This question is, whether the provision in the latter clause of the section, that " the same" (slaves emancipated by will,) "shall descend to and be distributed amongst the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate," applies as well to wills made after its passage, as to those made and admitted to probate before its passage.

It would appear, at first view, that this provision had reference to slaves intended to be emancipated by wills made and probated before the passage of the act, as it immediately follows the clause providing for such wills, and the words "the same" slaves, would seem to refer to such as were just spoken of. But when we consider the policy which the legislature intended to establish, it is clear that the provision in question must have been intended to apply to all emancipations of slaves by will, whether made before or after the passage of the act.

It was undoubtedly the object of the legislature to prevent the emancipation of slaves, and to make provision, in all cases of attempted emancipation by will, for the condition of slaves, as to the parties interested in them, after such attempted emancipation. There could be no reason why the legislature, in instituting a policy prohibitory of the emancipation of slaves, should not have made the same provisions with regard to such as should be emancipated by wills made after the passage of the act, as to slaves embraced in wills already made and probated. Indeed, the former would appear to be especially within the policy intended to be established, as the prohibition would operate, for the most part, upon that class; and the only difference between the two classes of emancipations would appear to be that, as to the former, the act took effect immediately, whereas, as to slaves previously emancipated, provision was made for their removal from the state within a limited time. This appears to be the only difference between the two

classes of slaves embraced in the policy adopted by the legislature, and we are unable to perceive why the rule of property prescribed for the latter class, should not be applicable, with at least equal force, to the former. Both classes come equally within the policy of the act, and the provision as to the condition of the property, would appear to be much more justly applicable to cases occurring after the passage of the act, than to such as already existed.

Looking, therefore, to the spirit and policy of the act, we are of opinion that the provision under consideration has reference to wills made after the passage of the act, as well as those existing and probated at the time of its passage.

The decree is reversed, the demurrer overruled, and the cause remanded, and the defendant required to answer within sixty days.

FISHER, J., dissented.